UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION


JOHN DOE,

      Plaintiff,

v.

NORTHERN MICHIGAN UNIVERSITY,
JANET KOSKI, DONNA BEAUCHAINE,
in their individual and official capacities,
and CHRISTINE GREER,
in her official capacity only,
jointly and severally,

      Defendants.

Case No.

Hon.

_____

David A. Nacht (P47034)
Adam M. Taub (P78334)
NACHTLAW, P.C.
Attorneys for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dnacht@nachtlaw.com
ataub@nachtlaw.com
_____

## COMPLAINT AND JURY DEMAND

      Plaintiff, John Doe, by and through his attorneys, NACHTLAW, P.C.,

hereby alleges as follows:

## INTRODUCTION

1.     On or about April 6, 2018, Defendant Northern Michigan University ("NMU" or "University") expelled Plaintiff John Doe from campus after finding him responsible of an alleged sexual assault.

2.     In the process of expelling Plaintiff, Defendants illegally gave deference to the allegations of the female accuser while assuming that the accused male was responsible even when the weight of the evidence was to the contrary.

3.     In the academic setting, in Title IX proceedings, accused males, including Plaintiff, are being denied basic due process, impartiality, and fair investigations, hearings, and appeals. *See Doe v. Baum*, 2018 U.S. App. LEXIS 25404 (6th Cir. Sept. 7, 2018); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017).

4.     Unfortunately, educational institutions, like NMU, are not leaving sexual assault investigations to the police and criminal justice system with their related procedural protections, and instead, are adjudicating the sex lives of students—most of whom are living without parental oversight for the first time— without providing the accused fair protections.

5.     Here, Plaintiff's life has been irreparably upended due to a broken system that led to his expulsion for engaging in consensual activity with his accuser, Jane Roe ("Roe"), during his freshman year of college, on or about October 30, 2016.

6.     Plaintiff and Roe first met in or about September 2016 while both were working in a cafeteria on campus.

7.     That first day, they began talking at work, continued talking after work, and eventually engaged in consensual sex that night.

8.     The two continued engaging in consensual sexual activity once or twice a week through the end of October 2016.

9.     On or about October 30, 2016, Roe attended a pre-Halloween party without Plaintiff. When she was ready to leave, however, she contacted Plaintiff to walk her home.

10.    Roe did not seem drunk to Plaintiff, was not slurring her words, and could walk on her own.

11.    Plaintiff and Roe returned to Plaintiff's room where they engaged in consensual oral and vaginal sex, as they had before. Roe actively participated and at no point told Plaintiff "no" or to stop.

12.    Nearly a year-and-a-half later, Plaintiff was shocked to receive notice that he had been accused of sexually assaulting Roe. Roe had engaged in consensual sexual relations with Plaintiff after October 30, 2016, and on information and belief, at no point during that period did Roe go to the police—as of the date of this Complaint, Plaintiff has received no indication that she has.

13.     Defendant Donna Beauchaine then began the process of an inadequate and biased investigation into Roe's allegations during which—contrary to Title IX—she overstepped her role as an information gatherer and ignored the evidence exonerating Plaintiff and credited Roe's inconsistent statements.

14.     NMU also deprived Plaintiff of a fair hearing. In fact, Plaintiff did not receive a live hearing ***at all***.

15.     Plaintiff could not cross-examine his accuser in any way or even submit questions to a neutral person or board to ask her.

16.     As a result, NMU denied Plaintiff a fair and impartial investigation and hearing, in violation of Title IX and NMU's own policies.

17.     Defendant Janet Koski, NMU's Title IX Coordinator, subsequently refused to recognize the flagrant violations of Plaintiff's rights and upheld the decision to expel Plaintiff from NMU.

18.     Therefore, Plaintiff brings the instant action.

## **PARTIES AND JURISDICTION**

19.     Plaintiff John Doe ("Doe" or "Plaintiff"), who requests anonymity in this matter as an alleged perpetrator of sexual assault who has never been criminally charged or investigated, is a resident of Marquette County, Michigan. He will file the appropriate motion for anonymity if necessary and requested by this Court.

4

20.     Based on the facts detailed below, Defendants will be able to identify Plaintiff and will not be prejudiced by the use of a pseudonym.

21.     Defendant Northern Michigan University ("NMU" or "University") is a public university located in Marquette, Marquette County, Michigan.

22.     The events at issue occurred in Marquette, Michigan, which lies in Marquette County and the Western District of Michigan.

23.     Defendant Donna Beauchaine is the University's misconduct investigator. On information and belief, she works and/or resides in Marquette County and the Western District of Michigan.

24.     Defendant Janet Koski is the University's Title IX Coordinator. On information and belief, she works and/or resides in Marquette County and the Western District of Michigan.

25.     Defendant Christine Greer is the University's Dean of Students. On information and belief, she works and/or resides in Marquette County and the Western District of Michigan.

26.     This Court has general federal question jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff brings his claims pursuant to the Civil Rights Act, 42 U.S.C. § 1983, and Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 *et seq*. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims.

27.    Venue is proper in this Court because Defendants obligated themselves to Plaintiff within the Western District of Michigan, the University is located within the Western District of Michigan, and, upon information and belief, Defendants reside within the Western District of Michigan.

## GENERAL ALLEGATIONS

**A.    Background**

28.    Prior to matriculating at NMU, Plaintiff attended North Branch High School in North Branch, Michigan. There, Plaintiff was an excellent student, on the honor roll, and had no disciplinary record.

29.    He earned admission to NMU and was excited to begin his collegiate experience in fall 2016.

30.    In order to earn some income while in school, Plaintiff began working at the Market Place Cafeteria on the University's campus in or around the summer of 2016. He worked the grill there.

31.    While working in or about September 2016, he noticed Jane Roe ("Roe"), who had just begun working at the cafeteria and was serving pizza in the same section as Plaintiff.

32.    As the two worked in close proximity, they began talking while working.

33. The first day they met, after work, Plaintiff invited Roe to go to a convenience store where they continued talking.

34. The two then went to Plaintiff's dorm room.

35. Once there, they continued talking, began cuddling on Plaintiff's bed, and eventually had consensual sex.

36. After their first sexual encounter, Plaintiff and Roe agreed to a "friends with benefits" situation in which the two would usually see each other once or twice a week and engage in consensual sex.

37. Their relationship continued in this manner through the end of October 2016.

38. On or about October 30, 2016, Roe attended a pre-Halloween party without Plaintiff.

39. From the party, Roe texted Plaintiff that she wanted him to come pick her up from the party.

40. Plaintiff came and walked with Roe back to his dorm room.

41. Roe did not seem drunk to Plaintiff, was not slurring her words, and could walk on her own.

42. At no point on October 30th did Plaintiff witness Roe consume alcohol or provide her with alcohol.

43.     Once Plaintiff and Roe went to Plaintiff's room, the two talked for a couple minutes and then began engaging in sexual activity as they had in the past.

44.     Roe actively participated in the sexual activities, willingly performing fellatio and engaging in penetrative sex.

45.     At no point did Roe tell Plaintiff "no" or to stop.

46.     In fact, Plaintiff asked Roe if he could take a video of Roe performing fellatio on him. Roe agreed on the condition that Plaintiff not publicly post the video.

47.     At all times, Roe actively participated in the sexual encounter, was coherent, and was able to say "no."

48.     At all times relevant hereto on October 30, 2016, Roe was awake and alert. She was coherent, able to walk on her own, and fully functional.

49.     At the time Plaintiff and Roe had sex, Roe was not incapacitated and gave knowing consent for their sexual encounter. In fact, she initiated oral sex with Plaintiff.

**B.      Plaintiff and Roe's Ongoing Relationship**

50.     Following October 30, 2016, Plaintiff and Roe continued communicating with each other via text message.

51.     They would have text conversations once to twice a month.

52.     At some point, Roe came to Plaintiff's room and told him that she did not want to have sex with him on October 30, 2016 and was too drunk to say anything.

53.     Plaintiff did not recall the events that way but apologized.

54.     The two agreed to remain friends and even laughed about the incident.

55.     Plaintiff thought the two had moved on, and they continued having text conversations even after this conversation.

56.     During one of these text conversations, Roe—unprompted—asked Plaintiff to delete the video he had taken of Roe performing fellatio from October 30th.

57.     Plaintiff complied with her request.

58.     Roe also confronted Plaintiff about what happened on October 30th via text message.

59.     In the text conversation, Roe admitted that Plaintiff had told her that he was unaware that she was drunk that night. She also stated that she saw Plaintiff as a friend.

60.     During the summer or fall of 2017, Plaintiff invited Roe to show her the new off-campus house he was staying in.

61.     Roe came over and after talking for a couple of hours, Roe and Plaintiff engaged in consensual sexual activities.

9

62.     Plaintiff texted Roe two to three times over the following month or two, but Roe did not respond.

## C.     Investigation

63.     Nearly a year-and-a-half after the October 30th incident, on or about March 16, 2018, a formal investigation was initiated by Roe, where allegations and information were submitted for investigation to Defendant Donna Beauchaine to investigate Roe's claims.

64.     Specifically, Roe alleged that Plaintiff:

  a.  Undressed her without her consent;

  b.  Forced her to perform oral sex on him, knowing or that he should have known that she could not consent due to her level of intoxication; and

  c.  Had penile/vaginal intercourse with her without her consent, knowing or that he should have known that she could not consent due to her level of intoxication.

65.     Plaintiff was shocked as he thought that he and Roe were still friends, they had engaged in consensual sexual activity after October 30, 2016, and he had not even attempted to contact Roe since around January 2018.

66.     Under NMU's Sexual Misconduct Policy, sexual assault is defined as "a legal term that means sexual contact without consent." Specifically, NMU's

10

policy defines sexual assault as the same as any of the forms of criminal sexual conduct described in MCL 750.520b-750.520g of the Michigan Penal Code.

67.    Furthermore, Policy provides:

Sexual assault consists of sexual intercourse without consent, forcible sodomy or sexual penetration with an inanimate object, the intentional touching of an unwilling individual's intimate parts (defined as genitalia, groin, pelvic region, inner thigh, breast or buttocks, or clothing covering them), or forcing an unwilling individual to touch another's intimate parts. ***These acts must be committed either by force, threat, intimidation, or by taking advantage of someone's helplessness or inability to consent of which the alleged perpetrator was aware or should have been aware***. Regardless of the relationship that exists between the parties, if consent is not given or force or coercion is used against a party, any sexual contact is within the definitions of criminal sexual conduct and sexual assault.

(emphasis added).

68.    Consent is defined as, "an affirmative, conscious decision by each participant to engage in mutually agreed-upon sexual activity."

69.    Furthermore, "Consent cannot be obtained through the use of force, coercion, threats, or intimidation, or by taking advantage of the incapacitation of another individual."

70.    The Policy also states:

Northern Michigan University considers sexual encounters while under the influence of alcohol or other drugs to be risky behavior. Alcohol and other drugs impair an individual's decision-making capacity, awareness of consequences, and ability to make informed judgments. If there is any doubt as to the level or extent of the other individual's intoxication or impairment, the prudent course of action is to cease any

11

sexual contact or activity. ***Consent cannot be given if an individual is incapacitated by alcohol or other drugs***.

(Emphasis added).

71.     Finally, the Policy defines incapacitation "as the inability, temporarily or permanently, to give consent because the individual is ***mentally and/or physically helpless, asleep, unconscious, or unaware that sexual activity is occurring***.  Incapacitation can occur as a consequence of alcohol or other drug use or because of a psychological condition." (Emphasis added).

72.     In addition to the above-referenced definitions, the Sexual Misconduct Policy provides the process that occurs when the University receives a report that student has allegedly engaged in sexual misconduct.

73.     According to the Policy, once a report is made and the Title IX Coordinator records information regarding the report, an email is sent to the complainant from the Associate Dean of Students or designee and/or the Title IX Coordinator. The email informs the complainant of:

- the opportunity to meet with the Associate Dean of Students or designee. (The complainant will not need to share details of the incident unless they choose to do so.),

- internal resources available to the complainant,

- external resources available to complainant,

- assistance available, such as arrangements for a "no-contact" order, assistance with starting a criminal investigation or University investigation, assistance with free counseling services, classroom remedies, safety remedies, residential remedies, etc.,

- university response to retaliation, and

- contact information for the Title IX Coordinator.

74.   Following the email to the complainant, NMU begins its initial investigation, which:

- assesses the nature and circumstances of the report,

- addresses immediate physical safety and emotional well-being concerns,

- notifies the complainant of the right to contact or decline to contact law enforcement if the conduct is criminal in nature, and if requested, assist the complainant with notifying law enforcement,

- notifies the complainant of the availability of medical treatment to address physical and mental health concerns,

- notifies the complainant of the importance of preservation of evidence

- informs the complainant of her rights,

- discusses the complainant's expressed preference for manner of resolution and any barriers to proceeding,

- explains the University's policy prohibiting retaliation, and

- considers whether the facts indicate a pattern of similar conduct by the respondent.

75.    When the allegations appear to violate this policy, the Title IX Coordinator will assign appropriately trained investigator(s) to handle the case.  The investigator(s) will:

    a. interview the complainant, the respondent and any other people mentioned as involved or potential witnesses to gather information.  ***At no time will the complainant be required to face the respondent or respondent's witnesses***;

    b. conduct an inquiry or examination sufficient to lead to a determination of facts—when undisputed facts lead to the conclusion that the conduct alleged would not constitute a violation of this policy, the investigator(s) will prepare a summary report to the Sexual Misconduct Review Board ("SMRB") for review and disposition; and

    c. determine if the allegations meet the definition of sexual assault, domestic violence, stalking or dating violence.  If so, the investigator(s) will prepare an investigative report. The complainant and respondent will be given the opportunity to review a draft investigative report. The complainant and respondent may submit any additional comment or evidence to the investigator(s) within five (5) calendar days of the

14

opportunity to review the relevant portions of the draft investigative report. Upon receipt of any additional information by the complainant or respondent, or after the five (5) day comment period has lapsed without comment, the investigator will submit the final report to the SMRB.

76.     Finally:

Once the report is finalized, it is submitted to the Sexual Misconduct Review Board. (SMRB: Title IX Coordinator or designee, The Assistant Vice President/Dean of Students or designee and the lead investigator assigned to the incident). The SMRB will determine a finding (responsible, not responsible, or insufficient information to make a finding) ***based on the Preponderance of the Evidence standard***. The SMRB will impose a sanction, if applicable. If the determination is that the undisputed facts do not rise to a violation of this policy, the SMRB will either close the case or refer back to Title IX coordinator for further review. The SMRB may also refer the case to the Dean of Students office to consider other Student Code violations, or to other applicable University offices.

(Emphasis added).

77.     Plaintiff was first apprised of the allegations against him by Associate Dean of Students, Mary Brundage.

78.     Failing to follow NMU's policies, however, Ms. Brundage ***never*** advised Plaintiff of his right to have an advisor or attorney present at the meeting or offered Plaintiff information about on and off-campus resources or an explanation of the procedural options.

79.     Instead, she presented Plaintiff with a document giving him the option to affirm, deny, or state "no comment" for each allegation against him.

80.     She also told Plaintiff that his punishment could range from a verbal warning to expulsion.

81.     Nervous, and without representation, Plaintiff affirmed removing Roe's clothing on October 30, 2016 and having vaginal intercourse with her that night. As Roe had performed oral sex on him, however, he refused to affirm that charge.

82.     Plaintiff thought that affirming the allegation would lead to a lesser punishment.

83.     He also thought that once he explained his side of the story he may not receive any punishment at all.

84.     When Plaintiff attempted to tell Ms. Brundage his narrative of what happened on October 30, 2016, she interrupted him and told him that he would be able to tell his version of events to the investigator at a later time.

85.     On or about March 19, Defendant Beauchaine, who was assigned as the investigator, interviewed Roe.

86.     Roe's statement was that on October 30, 2016 she was drinking vodka screwdrivers and Smirnoff Ice but could not recall how much she drank. She contacted Plaintiff to come and get her. She recalled going to Plaintiff's room and going to the futon.

16

87.     Her statement then contains several inconsistent accusations.

88.     First, she alleged that she told Plaintiff that she did not want to do anything. But she also claimed that she was unable to move, form words, or talk.

89.     Second, she stated that she did not recall having oral or penetrative sex with Plaintiff. But she also alleged that she never gave Plaintiff permission for either act and can recall Plaintiff being on and in her.

90.     Finally, she claimed that she did not recall being naked until she ran to the bathroom to pee. But she later stated that she "stumbled" to the bathroom naked to pee and could not recall if it was before, during, or after she was assaulted. She then said that when she returned from the bathroom, Plaintiff suggested they lie together and watch television.

91.     Roe also alleged that she did not know about the video of her performing oral sex on Plaintiff until almost a year after the incident (August 9, 2017) when Plaintiff allegedly informed her that he had it. She then claimed that the video showed her eyes were glazed over and her face was glazed over.

92.     Roe also admitted to remaining in touch with Plaintiff after the alleged assault and that they had even been physically intimate after October 30, 2016.

93.     Plaintiff met with Defendant Beauchaine on March 21, 2018.

94.     She again presented Plaintiff with the charges against him.

95.     Failing to follow NMU's policies, however, Defendant Beuchaine *never* advised Plaintiff of his right to have an advisor or attorney present at the meeting, provided a written description of the violation and any charges issued, or offered Plaintiff information about on and off-campus resources or an explanation of the procedural options.

96.     Once given the opportunity, Plaintiff gave a statement to Defendant Beauchaine, which was inconsistent with his earlier admissions.

97.     Plaintiff explained the night of October 30, 2016 as described above.

98.     He stated that that night was not any different from any other night where they had hung out and had sex.

99.     He recalled taking her back to his dorm room, that she did not seem very drunk—he even stated that he had *never* seen Roe drunk, and that he did not force her to perform any sex acts.

100.    He recalled taking off Roe's clothing, but she never told him "no" or to stop, that Roe seemed normal, and that Roe was interested in sex.

101.    Plaintiff also stated that Roe performed oral sex on him prior to them engaging in vaginal intercourse.

102.    Furthermore, Plaintiff recalled asking if it was okay for him to record Roe performing fellatio on him. She agreed on the condition that he not post the video publicly.

18

103.   Plaintiff informed Defendant Beauchaine that he remained friends with Roe after October 30th and that the two had consensual sex around September 2017. He also stated that he had last tried to contact her around December 2017.

104.   Defendant Beauchaine never asked Plaintiff why he had affirmed two of the allegations against him if he disputed that Roe was too drunk to consent to their sexual activity and claimed that she had actively participated in it.

105.   Instead, Defendant Beauchaine was hostile throughout the interview, used a very aggressive tone, and used language suggesting that she presumed Plaintiff's guilt.

106.   Plaintiff met with Title IX Coordinator, Defendant Janet Koski, on March 28, 2018 to review the investigator's draft report, which contained Roe's statement, Plaintiff's statement, and text messages between Plaintiff and Roe.

107.   The text messages include a conversation regarding October 30th between Plaintiff and Roe in which Plaintiff denied knowing that Roe was drunk that night (which Roe explicitly stated she did not question), Roe admitted to still thinking of Plaintiff as a friend, and Plaintiff stated that Roe came onto him and denied that Roe told him "no."

108.   Defendant Koski instructed Plaintiff to comment on any errors in the report.

109. Again, Plaintiff was not informed of his right to have a representative or attorney present at the meeting.

110. Roe reviewed the draft report on March 30, 2018. She commented that she recalled bits and pieces of the vaginal intercourse and peed afterward to avoid a urinary tract infection. This comment, however, contradicts her initial statement that she could not recall whether she went to the bathroom before, after, or during the alleged assault.

111. Plaintiff was not given the opportunity to respond to Roe's statement; he could only review it and comment on the accuracy of his own statement.

112. Plaintiff was not given a live hearing.

113. Plaintiff was not given an opportunity to question Roe, either himself or via a representative or intermediary.

114. Plaintiff was not given the opportunity to present witnesses.

115. Defendant Beauchaine interviewed no witnesses other than Plaintiff and Roe even though Roe named other individuals who saw her on October 30, 2016 and could have testified to Roe's level of intoxication.

116. On or about April 2, 2018, Defendant Beauchaine finalized her report.

117. On or about April 6, 2018, Defendant Koski informed Plaintiff that the Sexual Misconduct Review Board ("SMRB") had met on April 5, 2018 to review the final investigation report.

118.   Based on a preponderance of the evidence standard, the SMRB determined that there was insufficient evidence to indicate use of force related to Roe performing oral sex on Plaintiff. The SMRB, however, found that Plaintiff had affirmed the other two charges: undressing Roe without her consent and having vaginal intercourse with Roe without her consent.

119.   Based on the findings, Defendants stated Plaintiff would be expelled effective May 5, 2018.

120.   The SMRB provided no rationale for its findings or level of sanction. The members of the SMRB were also not disclosed. On information and belief, the SMRB was comprised of Defendant Beauchaine, Defendant Koski, and a representative from the office of the Dean of Students.

121.   On or about April 27, 2018, Defendant Koski informed Plaintiff that the SMRB reconvened to review the video of Roe performing oral sex on Plaintiff.

122.   Based on the video, the SMRB revised its findings to find Plaintiff not responsible for the charge related to oral sex. Oddly, the SMRB reasoned that Plaintiff had not forced Roe to perform oral sex on him, but still found that he should have known that she could not consent due to being intoxicated.

123.   Nonetheless, the SMRB stated that it did not find any evidence, including the video, to change Plaintiff's affirmation to the other charges without explaining its reasoning.

124.   Without explanation, the SMRB also upheld the expulsion for May 5, 2018.

125.   In reality, the SMRB reached an erroneous conclusion based solely on Plaintiff's gender rather than the preponderance of evidence before the Board, in direct violation of NMU's policies and Title IX.

**D.   Appeal**

126.   Under NMU's Sexual Misconduct Policy, the University only considers appeals based on new information sufficient to alter a decision or other relevant facts not brought up in the initial investigation because the individual appealing did not know such information and/or facts at the time of the investigation.

127.   NMU does not consider information which was known to the individual appealing but not stated during the initial investigation.

128.   On May 9, 2018, Plaintiff sent two appeal letters to Defendant Koski.

129.   In one letter, Plaintiff stated that the hearing procedures violated his due process rights and Title IX, including the lack of legal representation, the length of time that passed between the event and the investigation, and the inability to confront his accuser. He also stated that the SMRB's failure to include a rationale for the result and sanctions violated the regulations to Title IX. He also raised his concern that he presented evidence inconsistent with any affirmation of the allegations against him, yet the SMRB did not weigh evidence and only accepted the recanted

affirmations. Finally, he argued that the great weight of the evidence demonstrated that Plaintiff did not sexually assault Roe.

130.   In the second letter, Plaintiff argued that the punishment imposed of expulsion was too severe. He pointed out that he and Roe had an intimate relationship before and after the incident and that a significant time had passed between the alleged sexual assault and Roe's report. He also again pointed out that he disputed his guilt and that the University should not have such confidence in his guilt, given the evidence, to warrant expulsion.

131.   Nonetheless, the appeals were denied.

**E.    Inherent Bias**

132.   In addition to the inherent biases in NMU's processes and procedures, *see infra*, the investigation into Plaintiff was inherently biased because of his gender.

133.   On information and belief, Defendant Beauchaine is inclined to believe female accuses and disbelieve accused males.

134.   In the investigation report, Defendant Beauchaine characterized Plaintiff's actions as "assault" instead of "alleged assault." Defendant Beauchaine also characterized one of Plaintiff's comments as "weird." Moreover, she mischaracterized the "weird" comment as occurring on October 30, 2016 when it was said to comfort Roe when Roe first confronted Plaintiff about her allegation that she could not recall what happened on October 30, 2016 months later.

23

135.   When meeting with Plaintiff, Defendant Beauchaine was hostile throughout the interview, used a very aggressive tone, and used language suggesting that she presumed Plaintiff's guilt.

136.   Defendant Beuchaine and the SMRB, including Defendant Koski, ignored the female accuser's (Roe's) inconsistent statements.

137.   Defendant Beuchaine and the SMRB, including Defendant Koski, ignored the accused male's (Plaintiff's) consistent story that Roe consented to participating in all sexual acts and was not intoxicated to the point of incapacitation.

138.   Defendant Beuchaine and the SMRB, including Defendant Koski, ignored the accused male's (Plaintiff's) complete and total revocation of his affirmations that he undressed Roe without her consent or had vaginal intercourse with Roe without her consent.

139.   Defendant Beuchaine and the SMRB, including Defendant Koski, failed to apply NMU's Sexual Misconduct Policy to the accused male (Plaintiff) by claiming that Roe could not consent due to intoxication, even though the Policy provides that consent cannot be obtained if the accuser is "incapacitated" not "intoxicated." The evidence does not demonstrate that Roe was "incapacitated" as defined by the Policy, *see supra*.

140.   Defendants denied the accused male (Plaintiff) of procedural safeguards in NMU's policies, including but not limited to, advising Plaintiff of his

right to have an advisor or attorney present at the meeting and offering Plaintiff information about on and off-campus resources or an explanation of the procedural options.

141.   Furthermore, NMU's Sexual Misconduct Policy, on its face, is meant to support accusers, rather than both the accuser and the accused.

142.   Accusers are provided both verbal information and a pamphlet explaining the services, assistance and support that are available. The accused are not.

143.   NMU makes efforts to protect the anonymity of accusers but not the accused.

144.   After a report of sexual misconduct, NMU offers to help the accusers with several options that may be helpful or even necessary to continue living and feeling safe in a University residence or attending classes. These include options such as moving the respondent to other housing, moving the complainant to other housing, changing class sections or schedules, contacting teachers about missing a class, and more. The same offer is not extended to the accused.

145.   In fact, NMU provides interim measures in which the accused could be suspended or required to change residence halls, class schedule, or work schedule.

146.   NMU also considers the expressed preference for the accuser regarding the manner of resolution, including level of sanction.

147.   On information and belief, NMU knew, when it wrote the Policy, that nearly all of the individuals who are accused of sexual misconduct are men, and nearly all of their accusers are women. Thus, it understood that the Policy, as written, is more protective of women than men.

148.   Furthermore, NMU was under societal pressure to punish male accused and protect female accusers.

149.   On September 22, 2017, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. See, e.g., https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

150.   The interim guidance and review suggests that the practices in place at all times relevant to this lawsuit were unfair and, ultimately, out of step with the goal of gender equity in Title IX-related proceedings. See "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

151.   For example, the new OCR guidance, in a significant departure from the 2011 Dear Colleague Letter, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear

and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings.

152.   Significantly, the new OCR guidance also requires that "Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."

153.   It further states:

[T]he decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, ***including the Investigative Report. The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility***."

(Emphasis added).

154.   The Policy to which Plaintiff was subject, at least as to the process by which the claims against him were adjudicated, sets forth the procedures by which NMU students like Plaintiff, who have been accused of violating one or more of the enumerated offenses, are investigated, heard and, possibly, disciplined.

155.   Although NMU promised Plaintiff certain above-described process rights under the Policy, Defendants nevertheless treated him in a manner that clearly violated his rights under the Policy, the Fourteenth Amendment, and Title IX, as set forth more fully below.

## COUNT I
## PROCEDURAL DUE PROCESS
### (*Against Defendants Janet Koski and Donna Beauchaine in their individual and official capacities and Defendant Christine Greer in her official capacity only*)

156.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

157.   At all times relevant hereto, as a student, Plaintiff had a clearly established property right in his continued enrollment at NMU under the 14th Amendment of the U.S. Constitution.

158.   Defendants Janet Koski and Donna Beauchaine, acting in their individual and official capacities, and Defendant Christine Greer in her official capacity only, at all relevant times herein, including but not limited to their words and actions regarding the investigation, the pre-sanction communications, the sanction, and the appeals determination deprived Plaintiff of his constitutional clearly established property right to continued enrollment at NMU by permanently expelling him, and otherwise as alleged above.

159.   Defendants deprived Plaintiff of his constitutional property right to continued enrollment at NMU without due process of law, as Plaintiff did not have a live hearing in front of the SMRB, the ability to cross-examine his accuser or other witnesses, was denied legal representation, was judged on a preponderance of the evidence standard despite NMU basing its sexual assault definition on the Michigan penal code, was subjected to Defendant Beauchaine serving as investigator and

judge, and was denied an explanation for the SMRB's findings and level of sanction, and as otherwise alleged above. *See Doe v. Baum*, 2018 U.S. App. LEXIS 25404 (6th Cir. Sept. 7, 2018); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017).

160.   Plaintiff's ability to adequately respond to the charges against him was compromised.

161.   Defendants failed to state the specific evidence it relied on in the investigation report to sanction Plaintiff before or after sanctioning him.

162.   Defendants failed to allow Plaintiff to cross-examine his accuser before or after sanctioning him despite Plaintiff's claims that his accuser's allegations were not credible.

163.   Defendants failed to follow their own procedures in sanctioning Plaintiff.

164.   At all relevant times, Defendants were acting under color of state law.

165.   At all relevant times, Defendants Janet Koski and Donna Beauchaine, acting in their individual and official capacities, and Defendant Christine Greer in her official capacity only, were executing official NMU policy by making edicts or acts depriving Plaintiff of his constitutional rights, by representing the official policy of NMU, by accepting findings that were made in contravention of NMU policy regarding such investigations, and by then moving and falsely finding Plaintiff had

29

violated the Sexual Misconduct Policy, which caused Plaintiff to subsequently be permanently expelled.

166.   Subsequently, Defendants Janet Koski and Donna Beauchaine, acting in their individual and official capacities, and Defendant Christine Greer in her official capacity only, executed official NMU policy by then moving and sanctioning Plaintiff by permanently expelling him from NMU.

167.   Accordingly, Defendants are liable to Plaintiff pursuant to 42 USC § 1983 for their deprivation of Plaintiff's constitutional rights, and damaging him as alleged herein and below.

168.   This unlawful violation of Plaintiff's due process rights proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

169.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
## VIOLATION OF TITLE IX
### (*Against Defendant Northern Michigan University*)

170.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

171.   Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

172.   Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Northern Michigan University.

173.   Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

174.   Title IX claims arising from collegiate disciplinary hearings are generally analyzed under two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

175.   Both an "erroneous outcome" and an "unjustly severe penalty" occurred in this case.

176.   Plaintiff was innocent and wrongly found to have committed a violation of NMU's Sexual Misconduct Policy, and gender bias was a motivating factor.

177.   NMU imposed an unwarranted and excessive sanction on Plaintiff as a result of an erroneous outcome reached by a flawed disciplinary process, and gender bias was a motivating factor.

178.   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the ***prompt and equitable resolution*** of student . . . complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

179.   The "prompt and equitable" procedures that a school must implement include, at a minimum:

   a.   "Notice . . . of the procedure, including where complaints may be filed";

   b.   "Application of the procedure to complaints alleging [sexual] harassment . . .";

c. "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

d. "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

e. "Notice to the parties of the outcome of the complaint . . . ."

180. Furthermore, under 20 U.S.C. § 1092(f)(8)(B)(iv):

Procedures for institutional disciplinary action in cases of alleged domestic violence, dating violence, sexual assault, or stalking, which shall include a clear statement that—

(I) such proceedings shall—

(aa) provide a prompt, fair, and impartial investigation and resolution . . . .

181. The regulations for Title IX further clarify:

A prompt, fair, and impartial proceeding includes a proceeding that is–

(A) Completed within reasonably prompt timeframes designated by an institution's policy, including a process that allows for the extension of timeframes for good cause with written notice to the accuser and the accused of the delay and the reason for the delay;

(B) Conducted in a manner that-

(1) Is consistent with the institution's policies and transparent to the accuser and accused;

(2) Includes timely notice of meetings at which the accuser or accused, or both, may be present; and

(3) Provides timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings; and

(C) Conducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused.

34 C.F.R. § 668.46(k)(3)(i).

182. And "the result must also include the rationale for the result and the sanctions." 34 C.F.R. § 668.46(k)(3)(iv).

183. Based on the foregoing, Defendants failed to conduct an adequate, reliable, and impartial investigation of Roe's complaint.

184. NMU failed to provide any rationale for its decision. The SMRB simply stated that Plaintiff was responsible under a "preponderance of the evidence" standard.

185. Additionally, the SMRB entirely failed to state what evidence they relied on or what evidence they considered in reaching their conclusion.

186. Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff.

187. As described above, these circumstances include, but are not limited to:

    a. From the outset, the investigation was slanted in favor of the female complainant;

b. The investigator, Beauchaine, conducted her investigation and used investigative techniques in a manner designed to attempt to credit the female complainant's version of events and to discredit the male respondent's version of events;

c. Beauchaine characterized Plaintiff's actions as "assault" instead of "alleged assault." Defendant Beauchaine also characterized one of Plaintiff's comments as "weird." Moreover, she mischaracterized the "weird" comment as occurring on October 30, 2016 when it was said to comfort Roe when Roe first confronted Plaintiff about her allegation that she could not recall what happened on October 30, 2016 months later;

d. When meeting with Plaintiff, Beauchaine was hostile throughout the interview, used a very aggressive tone, and used language suggesting that she presumed Plaintiff's guilt;

e. Beauchaine ignored the evidence that credited Plaintiff's account of the events and only credited Roe's accounts of the events;

f. Beauchaine accepted the complainant's statements at face value, despite the lack of corroboration for many of her assertions and the inconsistent statements she had made;

g. Beauchaine and the SMRB ignored Plaintiff's complete and total revocation of his affirmations that he undressed Roe without her consent or had vaginal intercourse with Roe without her consent; and

h. Defendants reached a final decision that was directly at odds with the reliable and credible evidence they had, and at odds with NMU's policies concerning consent and incapacitation. The explanation for their determination is bias against Plaintiff, a male student.

188. Further, the SMRB essentially adopted Beauchaine's gender-biased treatment of the case and did so with procedures in which there is: no live hearing; no cross-examination; no sworn testimony; no provision for the respondent to have the opportunity to confront and question his accusers or witnesses against him—in fact, there is no opportunity to present questions to accusers in any manner at all; no provision for the respondent to have the opportunity to call witnesses in support of his defense before a fair and impartial decision-maker; and no presumption of innocence but rather a presumption that the female's accusations are true and no reasoned consideration of evidence as required by a burden of proof.

189. Further, NMU has created an environment where an accused male student is denied basic fairness and due process on the basis of sex.

190. NMU's Sexual Assault Policy demonstrates its gender-biased practices with respect to respondents, who are almost invariably male students, accused of sexual misconduct.

191. Specifically, without limitation, the Sexual Assault Policy:

   a. Was promulgated to provide recourse for complainants, the vast majority of whom are female, rather than to protect both parties throughout the process from unfair and inequitable treatment;

   b. Contains support resources and accommodations designed specifically *for complainants*, the vast majority of whom are female, but contains no comparable support resources and accommodations for respondents, the vast majority of whom are male; and

   c. Allows complainants, the vast majority of whom are female, to dictate sanctions, including interim sanctions, against respondents, the vast majority of whom are male.

192. Based on the foregoing, the NMU Sexual Misconduct Policy is inherently discriminatory against male students accused of misconduct. The Policy fails to ensure a fair and impartial investigation and hearing process.

193. Moreover, Defendants applied these policies and procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome.

194.   Defendants also imposed an unjustly severe penalty on Plaintiff, and they did so on the basis of his gender.

195.   Defendants imposed a sanction of expulsion despite the fact that NMU's policies explicitly state that there are other disciplinary options for students found responsible for a non-consensual sexual act.

196.   On information and belief, Defendants imposed this unjustified sanction in an effort to appease campus victims' rights advocates.

197.   Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him (the male) responsible for sexual assault and be punished severely for it.

198.   This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

199.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III
## BREACH OF CONTRACT
### (*Against Defendant Northern Michigan University*)

200.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

201.   Plaintiff applied to and enrolled in the College and paid associated fees and expenses, including tuition.

202.   Plaintiff did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including the Sexual Misconduct Policy.

203.   An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and the University.

204.   The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

205.   Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Plaintiff, and the covenant of good faith and fair dealing contained therein.

206.   Defendants committed several breaches of their agreements with Plaintiff during and after the investigation process, falling outside the range of reasonable expectations of one reading NMU's policies. *See Faparusi v. Case W. Reserve Univ.*, 2017 U.S. App. LEXIS 19593, at *17-19 (6th Cir. Oct. 4, 2017); *Finch v. Xavier Univ.*, 689 F. Supp. 2d 955, 968-69 (S.D. Ohio 2010).

39

207.   For example, NMU breached its agreement with Plaintiff when it failed to utilize the preponderance of the evidence standard in reaching its decision per NMU's policy.

208.   Had Defendants done so, they would have reached the opposite conclusion; namely, that Plaintiff was not responsible for the misconduct alleged.

209.   Based on the above, a fair reading of the evidence reveals that Roe's account of the events lacked any corroboration or reliability. Yet Plaintiff was inexplicably deemed less credible.

210.   Based on the above, a fair reading of the evidence reveals that Roe was not incapacitated by alcohol as defined by NMU's Policy and did not lack the ability to consent.

211.   Defendants thus breached their contract with Plaintiff, and the covenant of good faith and fair dealing contained therein, when they failed to utilize and apply the requisite preponderance of the evidence standard.

212.   Defendants failed to provide a supportable rationale for their decision.

213.   In contravention of NMU's policy, Plaintiff was denied legal representation, which led to him erroneously affirming allegations against him.

214.   Accordingly, NMU breached its contract with Plaintiff, and the covenant of good faith and fair dealing contained therein, when it relied on Plaintiff's

affirmations to reach its decision despite Plaintiff's complete and total revocation of the affirmations based on his statement to Beauchaine.

215.   As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

216.   Plaintiff is entitled to recover damages for Defendant's breaches of the express and/or implied contractual obligations described above in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV
## BREACH OF CONTRACT: DENIAL OF BASIC FAIRNESS/ ARBITRARY AND CAPRICIOUS DECISION MAKING
### (*Against Defendant Northern Michigan University*)

217.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

218.   Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against Plaintiff were conducted with basic fairness.

219.   Defendants breached this duty of basic fairness by, without limitation:

a.   Failing to provide Plaintiff with the same protections explicitly afforded the complainant under NMU's Sexual Assault Policy, including, without limitation, the right to policies and procedures

41

designed to protect the rights of *both* complainants and respondents; and the right to a presumption of innocence unless and until the preponderance of evidence warrants a finding of responsibility;

b. Failing to provide Plaintiff the opportunity to have legal representation;

c. Failing to provide Plaintiff the opportunity to confront and question witnesses at a fair hearing;

d. Arbitrarily and capriciously finding that the complainant was incapacitated and unable to consent when the preponderance of evidence unquestionably showed that the complainant was neither incapacitated nor unable to consent; and

e. Arbitrarily and capriciously expelling Plaintiff when NMU's Policy explicitly provides for alternate discipline after a finding of a non-consensual sexual act.

220.  Defendant's breach of the duty to ensure basic fairness proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

221.  As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT V
## PROMISORY ESTOPPEL
### (*Against Defendant Northern Michigan University*)

222.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

223.   As described above, NMU's policies constitute a promise that the University and its agents will act in a manner described within them. NMU should have expected Plaintiff to rely on the policies stated in the policies when he enrolled in NMU and paid tuition, room, and board. Plaintiff reasonably expected NMU would honor its express and implied promises, including that of fundamental fairness and the implied covenant of good faith and fair dealing.

224.   Plaintiff relied to his detriment on these express and implied promises and representation made by Defendant.

225.   Injustice can only be avoided by enforcement of Defendant's representations.

226.   As a direct and foreseeable result of Defendant's failure to honor its promises, Plaintiff has suffered injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

227.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VI
## <u>NEGLIGENCE AND NEGLIGENCE PER SE</u>
### (*Against Defendants Janet Koski and Donna Beauchaine*)

228.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

229.   When Defendants, as agents of NMU, accepted Plaintiff's enrollment as a student, they entered into a duty of care towards Plaintiff to conduct themselves in a manner consistent with NMU's policies and in a non-negligent manner.

230.   Defendants breached their duty of care towards Plaintiff when they conducted the investigation, hearing, and appeal processes in a way that was indifferent to the truth of the allegations made against Plaintiff as described above.

231.   Because of Defendants' negligent conduct, Plaintiff has suffered severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

232.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VI
## <u>GROSS NEGLIGENCE</u>
### (*Against Defendants Northern Michigan University, Janet Koski, and Donna Beauchaine*)

233.   Plaintiff incorporates all preceding paragraphs above as though fully stated herein.

234.   Defendants were negligent and negligent per se in their investigation, hearing, and appeal processes regarding Plaintiff as described above.

235.   Defendants recklessly disregarded the rights of Plaintiff and were callously indifferent to the effects their conduct would have on Plaintiff's reputation, mental health, and future.

236.   Defendants' biases against Plaintiff amount to grossly negligent conduct and deviation from the standard of care.

237.   Defendants' grossly negligent conduct has caused Plaintiff severe emotional distress, injury to reputation, past and future economic loss, deprivation of due process, and loss of career prospects.

238.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## RELIEF REQUESTED

For all of the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

a.   Declare the practices and actions of Defendants in violation of Title IX and the common law;

b.   Compensatory damages for monetary and non-monetary loss in whatever amount he is found to be entitled;

d.   Exemplary damages in whatever amount he is found to be entitled;

e.   Punitive damages in whatever amount he is found to be entitled;

f.   A judgment for past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects, in whatever amount he is found to be entitled;

g.   An order of this Court reversing the sanctions imposed against Plaintiff by Defendants;

h.   An order of this Court awarding reinstatement of Plaintiff as a student of Northern Michigan University, if he so desires;

i.   An order of this Court removing the Complaint, Investigative Report and sanctions from Plaintiff's file;

j.   An injunction of this Court prohibiting any further acts by Defendants violating Plaintiff's rights;

k.   An award of interest, costs and reasonable attorney fees; and

l.   Whatever other relief this Court finds appropriate.

> Respectfully Submitted,
> NACHTLAW, P.C.
>
> /s/ David A. Nacht
> David A. Nacht (P47034)
> Adam M. Taub (P78334)
> Attorneys for Plaintiff
> 101 N. Main Street, Suite 555
> Ann Arbor, MI 48104
> (734) 663-7550

Dated: October 31, 2018

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHN DOE,

     Plaintiff,                                   Case No.

                                          Hon.

v.

NORTHERN MICHIGAN UNIVERSITY,
JANET KOSKI, DONNA BEAUCHAINE,
in their individual and official capacities,
and CHRISTINE GREER,
in her official capacity only,
jointly and severally,

     Defendants.

_____

David A. Nacht (P47034)
Adam M. Taub (P78334)
NACHTLAW, P.C.
Attorneys for Plaintiff
101 N. Main Street, Ste. 555
Ann Arbor, MI 48104
(734) 663-7550
dnacht@nachtlaw.com
ataub@nachtlaw.com

_____

## <u>DEMAND FOR TRIAL BY JURY</u>

    NOW COMES Plaintiff, John Doe, by and through his attorneys, NachtLaw,

P.C., and hereby demands for a jury trial in the above-captioned matter for all issues

so triable.

Respectfully Submitted,
NACHTLAW, P.C.

/s/ David A. Nacht
David A. Nacht (P47034)
Adam M. Taub (P78334)
Attorneys for Plaintiff
101 N. Main Street, Suite 555
Ann Arbor, MI 48104
(734) 663-7550

Dated: October 31, 2018